IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

      Plaintiff,

    v.

L.A. PIPELINE CONSTRUCTION
COMPANY, INC.,

      Defendant.

Case No. 2:08-cv-840
Judge Sargus
Magistrate Judge King

## OPINION AND ORDER

This matter is before the Court on Defendant L.A. Pipeline Construction Company, Inc.

("LAP")'s Motion for Summary Judgment or, in the Alternative, For Partial Summary Judgment.

(Doc. 51.)  For the reasons set forth below, LAP's motion is granted in part and denied in part.

## I.    BACKGROUND

At issue in this case is whether LAP subjected a class of seven black employees to a

racially hostile work environment.  LAP is in the business of building and maintaining pipelines

used to transport natural gas.  (*See* West Dep. 12-13.)  According to the testimony of Richard

West, president and owner of LAP, the work of building a pipeline is carried out by a variety of

"crews," each with different tasks to perform along the right-of-way of the pipeline.  (*See* West

Dep. 44-63.)  For instance, one crew moves down and clears the right-of-way to be occupied by

the pipeline, while another crew comes behind and digs a ditch for the pipe.  (*See* West Dep. 44-

63.)  Yet another crew comes behind to weld the pipe segments together, place it in the ditch, test

the pipe, and then restore the area to its original appearance as the pipe is covered. (*See* West Dep. 44-63.) Each crew is typically headed by a "foreman," who is responsible for directing the work of the other crew members, but who is also expected to work along with the rest of the crew. (Drake Dep. 22-23 ("Q. Okay. Now, tell me what your understanding of the foreman's job duties are? A. A foreman's job duties are we tell them what they're to do every morning, they're to go out, they're to do that job, they're to work with the hands. If anybody's got a problem, they're supposed to come to us.").) At a job site, overall supervision and direction of a project is performed by a superintendent or "spread boss," to whom the foremen report. (Waggoner Dep. 16.) All individuals coming to work on a project must be approved by the superintendent. (West Dep. 41.)

In completing its various contracts to build or maintain pipelines, LAP utilizes union labor. The company is a signatory to an instrument known as the "National Pipeline Agreement," which sets out the relationship between the Pipe Line Contractors Association and the four labor "crafts" involved in pipeline construction. (*See* West Dep. 76-77.) These crafts include equipment operators, laborers, teamsters, and welders, each of which is represented by a different union. (West Dep. 77.) Each crew can consist of workers from several different crafts. (West Dep. 53-56.)

The labor requirements for a particular project are subject to a "50/50" rule, wherein LAP has the authority to choose fifty percent of the workforce, and local unions representing each of the four crafts choose the other fifty percent. (*See* West Dep. 40-43.) According to West, however, LAP would generally try to use more workers from the local area. (West Dep. 42-43.) When projects are started, the first union worker to come on the job is the labor "steward" for his

2

or her particular craft, and is responsible for representing other workers from his or her union that may join the project. (West Dep. 39.) As the project progresses, the superintendent will work with the various labor stewards in bringing to the project more of the allotted number of local workers from the union to meet the project's labor demands. (West Dep. 43.)

The events giving rise to this lawsuit occurred in 2007 and 2008 in the Commonwealth of Virginia, where LAP was performing work on contracts near the towns of Elkton and Winchester. Jeff Waggoner, General Superintendent of LAP, and "right-hand man" of Richard West, oversaw the work on these contracts, and was assisted by Pete Drake. (*See* West Dep. 33, 38.) R.J. Beirne was a field office manager for the projects. (West Dep. 41.) On November 5, 2007, Kevin Madden, a black laborer on the contracts, filed a complaint with Plaintiff Equal Employment Opportunity Commission ("EEOC"), alleging that nooses had been displayed at the job site, and that his foreman, John Carper, had used racial slurs such as "wetback," and told Madden that where Carper lived, they did not like blacks and if blacks came there to work, they would be hung. (Madden Dep., Ex. 3, 2.) In investigating Madden's claims, the EEOC identified six other black workers claiming to have been subjected to a racially hostile work environment. A summary of each of their allegations follows.

### A.    THE CLAIMS OF KEVIN MADDEN

Kevin Madden began working as a laborer for LAP on July 24, 2007. (Madden Dep. 24-25.) On October 17, 2007, he was working on a crew headed by foreman John Carper. (Madden Dep. 37.) According to Madden, on the morning of that day, Carper and his crew stopped at a 7-Eleven while on the way to the job site. (Madden Dep. 41.) While parked at the 7-Eleven, Madden observed "noose symbols" hanging on the mirror of a truck being used by another LAP

3

crew. (Madden Dep. 41.) This crew included Foreman Gary Ramsey and worker Tim Harvey, who were apparently responsible for the nooses. (Waggoner Dep. 79.) When Madden asked what the nooses were for, a worker in the truck said "[i]t's for chickens" and started laughing. (Madden Dep. 42.)

According to Madden, later that morning, Carper indicated that the crew would be working through lunch, so Madden left the area where they were working to make a complaint. (Madden Dep. 42-43.) Edward Blackwell (a fellow claimant in this case) drove him to the "yard," where LAP's onsite offices were located. (Madden Dep. 43.) While there, Madden called union Steward Ken Judy and told him about the nooses and his belief that Carper was overworking the crew. (Madden Dep. 43.) Judy called Waggoner and then called Madden back and told Madden that Waggoner did not have time to talk to him. (Madden Dep. 43.) In turn, Madden then called his union. (Madden Dep. 43.) His representative told Madden that there was really nothing they could do because Madden's local union was only assisting another local on the job. (Madden Dep. 43-44.) The union representative did, however, offer Madden a new job that would start at Charlottesville the next day. (Madden Dep. 44.) Madden then informed office manager R.J. Beirne that he was quitting. (Madden Dep. 44.) Later, Madden and his cousin came back to the site where Carper's and Ramsey's crews were working and took pictures of the nooses. (Madden Dep. 45.)

According to Madden, prior to the incident on October 17th, in the context of a discussion of whether Madden would be going to work a job in West Virginia, Carper had told Madden that in West Virginia, a black person coming to work there would be hung. (Madden Dep. 83.) Carper further said that a black man had been found hanging under a bridge in West

4

Virginia, and Bo Flemming, a co-worker of Madden, concurred that black people were not welcome in West Virginia. (Madden Dep. 83.) Madden also claims that Carper used the terms "spic" and "wetback" directed at either himself or a Hispanic crew member. (Madden Dep. 84.) Madden claims that he interpreted the "nooses" he saw hanging on the truck that day as a racist gesture because of Carper's prior comments. (Madden Dep. 101.) Finally, Madden alleges that an employee of LAP had a confederate flag in his personal truck. (Madden Dep. 97-98.)

Madden claims that since the above incidents occurred, he has felt fear, from both the fact that his name was in the newspaper (apparently because the EEOC had issued a press release concerning this case), and what had happened at LAP. (Madden Dep. 120-21.) Madden also was hurt by the way Carper used racial epithets and by the nooses. (Madden Dep. 126-27.)

### B.     THE CLAIMS OF EDWARD BLACKWELL

Claimant Edward Blackwell worked as a teamster for LAP. (*See* Blackwell Dep. 27.) According to Blackwell, on a day when LAP President Richard West was visiting the job site, Blackwell spoke to West, but West ignored him. (Blackwell Dep. 139-40.) A few days later, Blackwell claims that he was talking to Dean Casto, a co-worker whom he considered a friend, and Casto said that West could be arrogant, and that in some parts of West Virginia, even a good black person would always only be a "nigger," apparently implying that West had snubbed Blackwell for racial reasons. (Blackwell Dep. 142-44.) Blackwell also claims to have seen the nooses hanging in Ramsey's truck on October 17, 2007, and claims to have seen another noose on an occasion before then. (Blackwell Dep. 91, 94.)

According to Blackwell, on an occasion when he was working with another worker on repairing the lights on a trailer, Foreman Bobby Wells approached and said "[w]hat are you guys

5

doing, nigger rigging?" (Blackwell Dep. 15.) Afterward, Wells apologized but said that was

how people talk in West Virginia. (Blackwell Dep. 133.) Finally, Blackwell claims that Bo

Flemming told him that Carper was calling the workers "niggers," "coons," and "wetbacks"

when they were not present. (Blackwell Dep. 146.)

Blackwell claims that he was offended by both West's conduct and Casto's remark.

(Blackwell Dep. 140, 144.) He also indicated that he was suffering from stress as a result of

what happened during his time working for LAP. (Blackwell Dep. 155-56.)

## C.   THE CLAIMS OF SAMUEL JACKSON

Claimant Samuel Jackson worked for LAP from June 2007 to March 2008, and again

from April 2008 to November 2008. (Jackson Dep. 22.) According to Jackson, on a day when

he was working along a very steep hill, he stated to his co-workers that they should use a rope to

lower him down and hoist him up the hill. (Jackson Dep. 47-48.) His foreman, Clyde Wade,

responded to this remark by saying that they could put a cable around Jackson's neck. (Jackson

Dep. 47-48.) Jackson also alleges that on one occasion he heard Foreman Dave Arbaugh

describing an incident to a group of LAP workers wherein Arbaugh claimed to have not been

available to help with work at the bottom of a hill because he had to babysit a "coon" (referring to

a Jamaican worker) at the top of the hill. (Jackson Dep. 59-62.)

According to Jackson, he also heard Carper use the term "wetback" while he was working

for Carper. (Jackson Dep. 40.) Bo Flemming told him that Carper also used the "n" word.

(Jackson Dep. 41-42.) Upon complaining, Jeff Waggoner relocated him to Wade's crew.

(Jackson Dep. 41.) In another alleged incident involving an LAP foreman, Jackson stated that he

was in a trailer one morning with others when a co-worker named Rusty came in and said "all

6

them niggers always killing each other," apparently in reference to something Rusty had seen on television. (Jackson Dep. 64-67.) Rocky Webb, then Jackson's foreman, apparently overheard this remark and just shook his head. (Jackson Dep. 68.) Jackson also claims that he heard a co-worker named Jim Lee refer to a bat that Lee kept in his truck as a "nigger knocker" and then looked at Jackson and said "Sam, I can hit you with this." (Jackson Dep. 53.) Finally, Jackson also asserts that oftentimes while working near bulldozers, the white operators would rev the engine in an apparent effort to scare him. (Jackson Dep. 43-44.)

According to Jackson, the names "hurt," and because of the above incidents, he felt sadness. (Jackson Dep. 72, 74.)

### D.  THE CLAIMS OF LAMONT BARBER

Claimant Lamont Barber worked for LAP from September 2007 through February 2008, and again from May 2008 through August 2008. (Barber Dep. 22.) Barber claims to have seen two nooses during his time working with LAP—one lying on a skid and the other lying on the ground next to a trailer. (Barber Dep. 51.) He saw the second noose in February 2008 and the first one some weeks before that. (Barber Dep. 52.) Barber claims to have been offended by the nooses. (Barber Dep. 54.)

Barber also asserts that on several occasions Foreman Dave Arbaugh would drive away in the truck, and leave his crew with no water. (Barber Dep. 38-39.) Arbaugh also expressed his hatred of Hispanic people, and, as a result, Barber felt that Arbaugh probably also had a hatred for him as a black person. (Barber Dep. 39.) Arbaugh allegedly told him there would never be a black foreman for LAP. (Barber Dep. 40.) Barber claims to have eventually quit working for LAP because of Arbaugh. (Barber Dep. 44-45.)

7

As for other allegations involving LAP foremen, Barber claims that Foreman Rocky Webb had an ongoing "joke" that Webb expressed to Barber that if Barber attempted to work in Logan County, West Virginia, he would be hung. (Barber Dep. 61.) Finally, Barber claims that an LAP foreman whose name he could not remember referred to him as "nigger." (Barber Dep. 65.) The same foreman also referred to him as "Bubba," "Buddy," "boy," and "color." (Barber Dep. 66; 88-89.)

Barber believed that he was treated harshly while working for LAP, and was upset by the nooses. (Barber Dep. 108-09.)

E.    **THE CLAIMS OF HOWARD MORRIS**

Claimant Howard Morris worked for LAP from September 2007 through December 2007 and again between April 2008 and June 2008. (Morris Dep. 14.) According to Morris, Foreman Dave Arbaugh frequently used the word "coon," although not directed toward him. (Morris Dep. 31-32.) For instance, Morris heard Arbaugh call a Jamaican worker "coon." (Morris Dep. 22-23.) A co-worker named Bill referred to the Jamaican worker as "chango," which Morris believes means "monkey" in Spanish. (Morris Dep. 22-23.) Morris also claims that Arbaugh would park the truck at the top of a steep hill and make him walk up it to get his lunch. (Morris Dep. 33-34.) According to Morris, he heard another foreman use the term "wetback" when referring to Hispanic workers, and was offended because he thought the foreman would also be capable of calling him racial epithets. (Morris Dep. 37.)

Morris claims to have suffered humiliation as a result of the above incidents. (Morris Dep. 41.)

8

### F.     THE CLAIMS OF AKEEM DURRETTE

Claimant Akeem Durrette was employed for the first time by LAP between August 2007 and January 2008.  (Durrette Dep. 49.)  During this time, he claims to have seen nooses lying around the job site at least three times a week.  (Durrette Dep. 49.)  Durrette also claims to have seen drawings on the pipeline of people with nooses around their necks and to have seen the "n" word written on the pipe and on port-o-johns.  (Durrette Dep. 56-57.)

According to Durrette, one day, while riding in a truck with co-worker Jimmy Tustin, they drove past a white woman sunbathing and Tustin turned to him and asked, "[w]hy do all white people want to be like niggers?"  (Durrette Dep. 40.)  On a day when new company hats had arrived at the job site, Durrette allegedly observed a white worker come out of a trailer and say "I got to get a hat before them niggers get them."  (Durrette Dep. 43.)  On another occasion, Durrette claims that he heard members of another crew using the "n" word.  (Durrette Dep. 44.)  Finally, Durrette claims to have heard LAP employees using the term "wetback."  (Durrette Dep. 46-47.)

### G.     THE CLAIMS OF TASIKE IZZARD

According to the EEOC, Claimant Tasike Izzard reported having seen six to eight nooses at the LAP work site.  (Pl.'s Mem. Opp'n 24.)  However, the EEOC's representations concerning Izzard are lacking evidentiary support in the record currently before the Court as no affidavit or deposition of Izzard supporting his claims has been filed on the docket.[1]

---

[1]While declining to speculate about the absence of evidence concerning *Tasike* Izzard's claims, the Court notes that as part of his investigation into the alleged racially hostile acts, Jeff Waggoner indicated that an individual named *Devin* Izzard reported seeing nooses while working for LAP.  (Waggoner Dep. 156-57.)  If Devin Izzard's deposition was taken, it has not been filed on the docket.  Nor is there any indication that Devin Izzard is a claimant in this case.

9

## II.    DISCUSSION

### A.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)(stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). In responding to a motion for summary judgment, however, the nonmoving party "may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in

10

this rule—set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587-88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

**B.    THE CIVIL RIGHTS ACT OF 1964**

The EEOC has filed suit against LAP alleging that LAP violated the claimants' rights under the Civil Rights Act of 1964, and seeks non-pecuniary and punitive damages.[2]  Title VII of the Civil Rights Act provides that it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his . . . conditions[] or privileges of employment[] because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (2006).  Title VII's protections encompass more than just a prohibition on tangible employment actions based on impermissible factors.  Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . ." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)(internal quotation marks and citations omitted).  In order to demonstrate a prima facie case of hostile work environment based on race, the EEOC must establish the following: (1) the

---

[2]The Parties have stipulated that the EEOC is not seeking recovery of backpay or past or future pecuniary losses.  (*See* Doc. 42.)

claimants are members of a protected class; (2) the claimants were subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the "harassment had the effect of unreasonably interfering with [claimant]'s work performance by creating an intimidating, hostile, or offensive work environment;" and (5) LAP is liable to the claimants. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999).

LAP concedes that claimants are African American, and thus are members of a protected class. LAP contends, however, that summary judgment should be granted to it as to the class of claimants as a whole or to individual claimants on the grounds that the EEOC has not produced enough evidence for a reasonable jury to conclude that the remaining elements of a hostile work environment are met. In the alternative, LAP asserts that the EEOC has not produced sufficient evidence establishing non-pecuniary damages or that an award of punitive damage would be appropriate in this case.

### C.    **TASIKE IZZARD**

As an initial matter, the Court notes that in supporting the claims of Tasike Izzard, the EEOC has proffered nothing more than a statement by Jeff Waggoner that Izzard had reported seeing six to eight nooses at the LAP work site. (*See* Waggoner Dep. 156-57.) Nothing has been submitted evidencing Izzard's subjective reaction to those nooses or whether and to what extent he may have suffered injury as a result of their presence. Additionally, as LAP has pointed out and as noted in Footnote 1, *supra*, Waggoner appears to be referring to an individual named Devin Izzard, not Tasike Izzard in the cited deposition testimony. Accordingly, the Court grants LAP summary judgment as to the claims of Tasike Izzard.

12

## D.    HARASSMENT CREATING A HOSTILE WORK ENVIRONMENT

For workplace harassment to rise to the level of a Title VII violation, "[t]he conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997)(citing *Harris*, 510 U.S. at 21-22). In determining whether a hostile work environment existed, a fact finder must consider the totality of the circumstances. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009). In doing so, it is appropriate to consider "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris*, 510 U.S. at 23). "[S]imple teasing, offhand comments, and isolated incidents (*unless extremely serious*) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)(internal citation and quotation marks omitted)(emphasis supplied). The analysis of the circumstances surrounding alleged harassment is not limited only to incidents that occur in a claimant's presence, "but comments or conduct of which a [claimant] had no knowledge cannot be said to have made her work environment hostile . . . ." *Barrett*, 556 F.3d at 515.

LAP points out that some of the incidents complained of by the claimants are not facially racial in nature. However,

> even though a certain action may not have been specifically racial in nature, it may contribute to the plaintiff's proof of a hostile work environment if it would not have occurred but for the fact that the plaintiff was African American. Indeed, a showing of the use of racial epithets in a work environment may create an inference that racial animus motivated other conduct as well.

13

*Jackson v. Quanex Corp.*, 191 F.3d 647, 662 (6th Cir. 1999)(internal quotations and citations omitted).  Thus, the Court may consider incidents that are not necessarily racial in nature in evaluating the totality of circumstances faced by the claimants.

It is also LAP's position that in determining whether the claims of the class members should survive summary judgment, the Court should not consider the racial slurs commonly directed at Hispanics that were overheard by the class members.  In support of its position, LAP cites *Barrett* for the proposition that "only harassment that specifically targeted those who associated with and advocated for African-Americans will result in an actionable hostile work environment claim for such individuals." *Barrett*, 556. F.3d at 516.  The EEOC responds by asserting that evidence of such slurs has probative value as to whether claimants were subjected to a racially hostile environment.  *See Schwapp v. Town of Avon*, 118 F.3d 106, 112 (2d Cir. 1997).

The Court essentially agrees with the EEOC and will consider evidence of slurs against other minority groups in evaluating the totality of the circumstances faced by each claimant.[3] Such evidence is probative of both the objective and subjective components of a hostile work environment claim.  For instance, it would not be objectively unreasonable for a jury to conclude that the expression of racial animus by a member of the majority toward one minority group would also tend to indicate animus by that individual toward other minority groups.  For the subjective component, several of the claimants in this case have testified that they were offended by slurs against Hispanics because they felt as though the slurs also indicated likely prejudice

---

[3]If the record were devoid of racially derogatory remarks, LAP's contention that slurs lodged against Hispanics could not create a hostile work environment for blacks might have more persuasive value.

14

against blacks. Such testimony goes to the issue of whether individual claimants subjectively perceived the working environment at LAP to be hostile.

LAP's reliance on *Barrett* is misplaced on this issue as *Barrett* was a case wherein white plaintiffs alleged that they had been subjected to a hostile work environment based on their association with and advocacy for black fellow employees. *See Barrett*, 556 F.3d at 506-10. The Court therefore reads the language from *Barrett* quoted above and cited by LAP as being limited to third-party advocacy or association type cases. This reading is appropriate in the context of a totality of circumstances test because, as explained above, it may be reasonable for a member of one minority group to conclude that statements from a majority individual evidencing animus against another minority group indicate likely prejudice against all minority groups. On the other hand, from the prospective of another majority member witnessing such statements (as was the case in *Barrett*), it would not make sense for majority member to conclude that statements against minorities are evidence of the speaker's animosity toward her own, majority group.

Below, the Court will address the allegations of each claimant in turn. The Court notes that LAP has pointed to several instances where the deposition testimony of the claimants is arguably contradicted by other evidence. However, "[i]n reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009). "[W]hen the non-moving party presents direct evidence refuting the moving party's motion for summary judgment, the court must accept that evidence as true." *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994) (citing *McLaughlin v. Liu*, 849 F.2d 1205, 1207 (9th Cir.1988)).

15

### 1.    KEVIN MADDEN

In evaluating the totality of the circumstances, the Court finds that a reasonable jury could conclude that Kevin Madden was subjected to a racially hostile work environment.  Madden has testified that he saw nooses hanging in trucks owned by LAP.  He also testified that his foreman told him blacks would be hung if they attempted to work in West Virginia.  Finally, Madden heard his foreman refer to Hispanic people using racial slurs and reported that a co-worker at LAP had a confederate flag in the co-worker's truck.  In the Court's view, the record contains a genuine issue of material fact as to the issue of a hostile workplace sufficient to defeat summary judgment.  Nooses are evocative of the lynching of blacks.  These nooses, coupled with the comments about hanging, could conjure fears of the most extreme forms of racial prejudice and violence in the mind of a reasonable person.  Additionally, Madden testified that he felt fear for his safety and was hurt by the above incidents.  Thus, a jury could conclude that Madden subjectively perceived the environment to be hostile.

### 2.    EDWARD BLACKWELL

Edward Blackwell claims that he was snubbed by LAP President Richard West, and later learned from Dean Casto that the snub may have been because of racial prejudice.  Casto specifically used the word "nigger" when conveying his thoughts to Blackwell.  LAP asserts that Casto's statement to Blackwell is hearsay and is thus not admissible in deciding a motion for summary judgment.  *See Jacklyn v. Schering-Plough Healthcare Products Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999).  Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  FED. R. EVID. 801(c).  Whether Casto's statement is hearsay depends on the purposes for which it

16

is offered. The statement would not be hearsay if offered only to prove that Casto had used the "n" word in Blackwell's presence or in considering Blackwell's subjective reaction to his environment. For the former, the significance of the statement is simply the fact that it was made and not its truth; for the latter, the significance goes to Blackwell's state of mind—belief that the company's president held racial prejudices would certainly impact whether an employee subjectively perceived an environment to be hostile. Thus, the Court may not consider Casto's statement as evidence that West snubbed Blackwell because of Blackwell's race, but may consider it in evaluating Blackwell's subjective mind state. The Court also may consider the fact that Casto used the "n" word in Blackwell's presence in evaluating both Blackwell's subjective perception of the environment and the objective nature of the environment.

With these conclusions in mind, in addition to the above incident with West and Casto, Blackwell claims to have seen the nooses on October 17, 2007, and to have seen a noose on another occasion. Finally, Blackwell claims that foreman Bobby Wells used the term "nigger rigging" in reference to a task being performed by Blackwell and that he was informed by Bo Flemming that Foreman John Carper was calling the workers "niggers," "coons," and "wetbacks" behind their backs.[4] Such language is racial in nature as epithets such as "nigger" and "coon" are unquestionably associated with prejudice and racial animus toward blacks. According to Blackwell, he was offended by what had happened. Accordingly, based on the above, the record discloses a genuine issue of material fact sufficient to defeat summary judgment. *See, e.g.,*

---

[4]The Court notes that Blackwell's deposition testimony concerning what Flemming had told him about what Carper was saying is hearsay for purposes of establishing that Carper did in fact make those statements. However, in his deposition, Flemming testified that Carper did use racial epithets behind the backs of black workers. (*See* Flemming Dep. 28.)

17

*Johnson v. United Parcel Serv., Inc.*, No. 03-5620, 2004 WL 3008776, at *9 (6th Cir. Dec. 21, 2004)("[c]ase law makes clear that the use of the word 'nigger,' even taken in isolation, is not a 'mere offensive utterance.'"(citing *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004); *Spriggs v. Diamond Auto Glass,* 242 F.3d 179, 185 (4th Cir. 2001))); *Jackson v. Quanex Corp.*, 191 F.3d 647, 662 (6th Cir. 1999)("an abundance of racial epithets and racially offensive graffiti could . . . constitute severe and pervasive harassment").

### 3. SAMUEL JACKSON

Samuel Jackson claims that a foreman made comments about putting a rope around his neck to drag him up a hill and also claims to have seen nooses and heard racial slurs such as "nigger" and "coon" used by or apparently condoned by foremen. He also claims that a co-worker called a club a "nigger knocker" and then said something about hitting him with it. Jackson claims to have been hurt and saddened by these alleged incidents. These allegations, especially the claimed episode about the rope, are extremely serious, and from them, a reasonable jury could conclude that Jackson was subjected to a hostile work environment.

### 4. LAMONT BARBER

As with Kevin Madden, Lamont Barber claimed to have seen nooses at the work site and also to have been informed on an ongoing basis by Foreman Rocky Webb that if he went to work in Logan County, West Virginia, he would be hung. Additionally, he claims to have been referred to directly as "nigger" by a foreman whose name he could not remember. He also heard Foreman Dave Arbaugh use slurs directed at Hispanics and felt as though such slurs also indicated Arbaugh's hatred of him. He felt as though he was being treated harshly and was saddened by the nooses. Accordingly, a reasonable jury could find that he was subjected to a

hostile work environment.

### 5.    HOWARD MORRIS

Howard Morris claims that Foreman Dave Arbaugh frequently used the word "coon," and that Arbaugh and a co-worker referred to a Jamaican worker as "coon" and "chango." He also claims that Arbaugh would make him walk up a steep hill to get his lunch out of the truck, and that another foreman referred to Hispanic workers as "wetbacks," which offended him because he believed that the foreman also would likely use racial epithets against blacks. He claims to have suffered humiliation as a result of these alleged incidents. Based on the above, the Court finds that the record contains a genuine issue of material fact as to whether Morris was subjected to a hostile work environment sufficient to defeat summary judgment.

### 6.    AKEEM DURRETTE

Akeem Durrette claims to (1) have seen nooses lying around the job site at least three times per week, (2) have heard co-workers use the "n" word and slurs against Hispanics, and (3) have seen racial graffiti on the pipeline and on port-o-johns. While this evidence may be enough for a jury to conclude that a reasonable person would have found the working environment to be hostile, the EEOC has produced no evidence that Durrette subjectively perceived the environment to be hostile. For instance, in his deposition, Durrette answered "no" when asked whether he had suffered humiliation, anguish, fear, or pain as a result of what had happened. (Durrette Dep. 59.) When asked if he liked working for LAP, if he liked the people he worked with, and if he was treated well at LAP, he answered yes. (Durrette Dep. 62.) Accordingly, the Court grants summary judgment to LAP as to the claims of Akeem Durrette on the grounds that the EEOC has produced no evidence from which a reasonable jury could conclude that Durrette

subjectively perceived the working environment to be hostile.

### E.     **LIABILITY OF LAP**

The EEOC can establish liability against LAP on two alternative theories depending on

whether the harassment was carried out by co-workers or supervisors. *See Barrett v. Whirlpool*

*Corp.*, 556 F.3d 502, 516 (6th Cir. 2009). "Employer liability for co-worker harassment is based

directly on the employer's conduct." *Hafford v. Seidner*, 183 F.3d 506, 513 (6th 1999). "An

employer is liable if it knew or should have known of the charged [] harassment and failed to

implement prompt and appropriate corrective action." *Id.* (internal quotations and citations

omitted). On the other hand, liability to an employer based on the harassing behavior of

supervisors is vicarious, and no showing that the employer knew of the harassment is required.

*Barrett*, 556 F.3d at 516. However, an affirmative defense to liability based on the conduct of

supervisors is available to an employer if it can establish: "(1) that it exercised reasonable care to

prevent and correct promptly any racially harassing behavior by its supervisor, and (2) that the

plaintiff employee unreasonably failed to take advantage of any preventive or corrective

opportunities provided by the employer or to otherwise avoid the harm." *Id.*

Here, LAP asserts that its foremen were not supervisors for purposes of creating vicarious

liability, or, in the alternative, that the above affirmative defense is applicable. LAP also asserts

that it should not be subjected to liability based on the actions of non-supervisory co-workers.

#### 1.     **FOREMEN AS SUPERVISORS**

The parties disagree over the legal definition of "supervisor" that should be applied by the

Court. LAP advocates for a narrower definition that would include employees "with the power

to *directly* affect the terms and conditions of the [claimant]'s employment" but exclude

20

employees "merely having authority to oversee aspects of another employee's job performance . .

." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004)(emphasis in original).[5]

EEOC advances a broader definition, promulgated in its own enforcement guidance, which

would include as supervisors employees with the "authority to direct the employee's daily work

activities." U.S. EQUAL EMPLOYMENT OPPORTUNITY COMM'N, ENFORCEMENT GUIDANCE ON

VICARIOUS EMPLOYER LIABILITY FOR UNLAWFUL HARASSMENT BY SUPERVISORS 4 (2010).

Here, it is evident from the record that LAP's foreman did not have authority to unilaterally hire,

fire, demote, transfer, discipline, or alter other workers' compensation. (*See, e.g.,* Waggoner

Dep. 40 ("Q. Now, with respect to firing, is it your testimony that only yourself and Pete Drake

had the authority on an LA Pipeline job site to fire employees? A. Absolutely.").)

The Sixth Circuit has stated, albeit in an unpublished opinion, that "[w]e have held that a

supervisor is 'an individual who serves in a supervisory position and exercises significant control

over the plaintiff's hiring, firing or conditions of employment.'" *Summerville v. Ross/Abbott*

*Laboratories*, No. 98-3517, 1999 WL 623786, at *7 (6th Cir. Aug. 10, 1999)(per

curiam)(quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 803 (6th Cir. 1994)). The

*Summerville* panel went on to state that "[t]he Supreme Court has never offered a definition for

'supervisor' under Title VII, and nothing in either [*Burlington Industries, Inc. v.*] *Ellerth*[, 524

U.S. 742 (1998)] or *Faragher [v. City of Boca Raton*, 524 U.S. 775 (1998)] suggests the

illegitimacy of the definition for 'supervisor' we adopted in *Pierce* (for example, *Ellerth* only

---

[5]In its brief, LAP also cited and quoted at length from *Tisdale v. Federal Express Corp.*,
415 F.3d 516 (6th Cir. 2005). LAP's reliance on *Tisdale*, however, is not appropriate as the
language quoted by LAP from *Tisdale* deals specifically with the issue of punitive damages and
whether employees served in a "managerial capacity" as opposed to whether employees were
"supervisors"for the purposes of attaching liability vicariously. *See id.* at 531-32.

21

speaks generally of a 'supervisor with immediate (or successively higher) authority')." *Id.*

(quoting *Ellerth*, 524 U.S. at 765).

Here, while it remains unclear whether the Sixth Circuit's statement in *Summerville* concerning the definition of "supervisor" is compatible with the broader definition advanced by the EEOC, because the EEOC has not produced evidence that LAP's foremen had the authority to hire, fire, or exercise significant control over the claimant's conditions of employment, and given the unique management structure in this case, the Court finds that LAP cannot be held vicariously liable for the harassing actions of its foremen. In this regard, LAP's foremen did not possess any hierarchical significance at LAP and are perhaps best characterized as team leaders or firsts among equals (see Drake Dep. 22) as opposed to the types of employees that could be considered supervisors for establishing vicarious liability. Because the Court finds that the foremen were not supervisors, the Court will not address whether the affirmative defense to vicarious liability has been established by LAP.

### 2. LIABILITY FOR HARASSMENT BY CO-WORKERS

Even though the EEOC has failed to establish disputed material facts as to whether the foremen were supervisors, LAP can still be liable for the harassment by the foreman and other employees of the claimants if EEOC can demonstrate that LAP knew or should have known about the racial harassment and did not implement prompt and appropriate corrective action. An employer's response to a hostile work environment created by co-workers is measured by a negligence standard. *See Fenton v. HiSAN, Inc.*, 174 F.3d 827, 829 (6th Cir. 1999)("[t]he victim of coworker sexual harassment must therefore prove negligence by the employer"). A response can be "adequate if it is reasonably calculated to end the harassment." *Jackson v. Quanex Corp.*,

191 f.3d 647, 663 (6th Cir. 1999). However, a response that "manifests indifference or unreasonableness in light of the facts the employer knew or should have known" will not suffice to avoid liability. *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 340 (6th Cir. 2008)(internal quotations omitted). As explained below, genuine issues of material fact exist as to whether LAP's responses to the claimant's allegations were reasonable.

The issue here is LAP's awareness of the claimants' allegations and what actions, if any, it took in response to them. Jeff Waggoner was LAP's General Superintendent and Richard West's "right-hand man." (West Dep. 33.) Waggoner had general oversight responsibilities over LAP's projects in Virginia. As an initial matter, the Court notes that Waggoner admitted that he would not be surprised that conversations among coworkers on pipeline projects would include race-related topics. (*See* Waggoner Dep. 127-32.) With regard to the allegations of Kevin Madden, according to Waggoner, on October 17, 2007 (the day Madden quit) Waggoner received a call from Ken Judy, a union representative, saying that Madden was upset about a noose in a company pickup truck and was taking pictures of it. (Waggoner Dep. 75.) R.J. Beirne later informed Waggoner that the string or rope that resembled nooses was hanging in the truck used by Foreman Gary Ramsey and worker Tim Harvey. (Waggoner Dep. 79.) Waggoner spoke with Ramsey and Harvey later that evening and asked them about the nooses. (Waggoner Dep. 81.) They informed him that the nooses were for hanging their safety glasses, and were not racially motivated. (Waggoner Dep. 81.) At this time, Ramsey also said that it was not a "legal" noose because it only had eleven wraps as opposed to thirteen. (Waggoner Dep. 82.) Waggoner told them not to tie rope like that again and to refrain from hanging anything in company trucks. (Waggoner Dep. 81.) According to Waggoner, he accepted the explanation of Ramsey and

Harvey that the nooses were not racially motivated. (Waggoner Dep. 86-87.) They were "let go" by LAP on November 16th, but the record is unclear as to whether they were laid off or fired or whether the nooses played any role in their termination. (Waggoner Dep. 86-87.) Waggoner never talked to Kevin Madden about what had happened, and said that he was not sure if it was his place to do so because Madden was an ex-employee. (Waggoner Dep. 90.)

Waggoner initially thought that his interview with Harvey and Ramsey had ended the matter, but he eventually learned that there "might be more offense." (Waggoner Dep. 87.) He investigated further and interviewed Edward Blackwell, Devin Izzard, Samuel Jackson, and Lamont Barber. (Waggoner Dep. 87-88.) According to Waggoner, he was prompted to investigate further and conduct these interviews when asked to do so by Columbia Gas, but also because he was made aware of the charge of discrimination that had been filed with the EEOC by Madden. (Waggoner Dep. 91-93.) The charge of discrimination made him realize that Foreman John Carper's actions were central to Madden's complaints, and that Carper should be investigated. (Waggoner Dep. 93.) Jackson indicated to Waggoner that he had heard Carper refer to a Hispanic worker as a "wetback," and felt as though Carper would be capable of using racial slurs against Jackson. (Waggoner Dep. 89.) Waggoner offered to move Jackson to another crew and Jackson agreed. (Waggoner Dep. 89.) Waggoner then spoke to Carper, who explained that he and Maximiliano Urrutia, a Hispanic worker, called each other epithets just for fun. (Waggoner Dep. 89.) Waggoner interviewed Urrutia, but claims that Urrutia did not have any complaints about Carper. (Waggoner Dep. 89.) LAP ended Carper's employment in January 2008 because of his inappropriate behavior. (Waggoner Dep. 47-51.) There is a dispute in the record as to whether Carper was actually terminated for cause, or merely laid off, as he was

24

apparently able to collect unemployment benefits after his relationship with LAP ended. (*See* Carper Dep. 20-21.)[6]

Waggoner's conversation with Edward Blackwell occurred on December 5th when Waggoner asked him if he had been subjected to any racial harassment. (Waggoner Dep. 148-49.) According to Waggoner, Blackwell stated that he had seen a few nooses and indicated that he would report any harassment to Waggoner. (Waggoner Dep. 150.) Waggoner's conversation with Devin Izzard occurred on December 19th, at which time Izzard reported to Waggoner that he had seen nooses. (Waggoner Dep. 156-57.) Waggoner also investigated the claim that Madden had been denied lunch by Carper, and concluded that it was typical for the pipeline that crews worked through lunch because union contracts required extra pay for workers in such circumstances. (Waggoner Dep. 98.)

In addition to the above, Waggoner was aware of an alleged incident wherein Amanda Warwick, an environmental specialist for Columbia Gas, reported that someone had drawn lewd pictures on the pipeline. (Waggoner Dep. 57-58.) According to Waggoner, Pete Drake immediately dispatched a crew to remove the graffiti. (Waggoner Dep. 58.) Waggoner denied that anyone ever reported to him the incident where Jim Lee referred to his small bat as a "nigger knocker," but was not surprised that Lee would make such a statement. (Waggoner Dep. 158-59.) Waggoner was surprised that Samuel Jackson had not reported the incident to him. (Waggoner Dep. 159.) According to Waggoner, Dave Arbaugh had not started working for LAP when Waggoner was conducting the investigation. (Waggoner Dep. 103-04.) Waggoner also

---

[6]In Virginia, following a discharge for "misconduct," an employee is not entitled to receive unemployment compensation benefits. *See* VA. CODE ANN. § 60.2-618 (2010).

claims that after the project moved to Winchester, Virginia, no racial slurs or nooses were reported.  (Waggoner Dep. 163.)

Waggoner denied that Howard Morris ever reported any racial slurs or harassment. (Waggoner Dep. 165-66.)  Waggoner also claims that he did not know of allegations that Clyde Wade or Jim Tustin were using racial slurs.  (Waggoner Dep. 129-30.)  As indicated above, other than his conversation with Ramsey and Harvey, Waggoner did not take any other action with regard to Madden's October 17th complaint about the noose until a complaint was received from Columbia Gas in early November.  (Waggoner Dep. 171.)  According to LAP President Richard West, upon receiving the complaint letter from Columbia Gas, he contacted Waggoner and instructed him to start looking into the matter immediately.  (West Dep. 104.)

As part of LAP's response to the noose complaints, Waggoner claims that he addressed issues of race and discrimination at three meetings.  At a November 29, 2007 meeting of the safety committee, the committee discussed the "rope incident," and race relations and agreed that "racial" incidents would not be tolerated.  (Waggoner Dep. Ex. 3.)  According to Waggoner, safety committees at LAP job sites usually consist of stewards, superintendents, general superintendents, and "anybody that wants to participate" and meetings of the committee are convened irregularly.  (Waggoner Dep. 127-28.)  Present at this particular safety committee meeting were Waggoner, Pete Drake, Tom Perez, the teamster steward, Sherman Moore, the operator steward, and Ken Judy, the labor steward.  (Waggoner Dep. Ex. 3.)  The meeting lasted at least half an hour and possibly up to forty-five minutes.  (Waggoner Dep. 143.)

In addition to safety committee meetings, LAP management also held weekly safety meetings with attendance from nearly the entire work force (other than welders) at LAP projects.

26

(Waggoner Dep. 172.)  According to Waggoner, following the November 29th safety committee meeting, he discussed issues of race relations.   (Waggoner Dep. 145-46.)  Waggoner told the meeting that any kind of conflict between the races was not to be tolerated.  (Waggoner Dep. 146.)  Waggoner also instructed everyone not to tie ropes into loops to avoid offending people. (Waggoner Dep. 85.)  Finally, at a meeting of project foremen on December 20, 2007, Waggoner discussed "allegations of mistreatment" and told the foremen to get rid of all ropes tied into loops.  (Waggoner Dep. 125.)

In addition to the above investigations and meetings, LAP contends that it did have what amounts to an antidiscrimination policy in place during the relevant time periods in the form of a provision in the National Pipeline Agreement which provides that "Employer and Union agree that neither of them shall take any action or refuse to take any action which shall discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individuals race, color, religion, sex, national origin or disability." (West Dep. Ex. 2, 14.)  Although there is no express procedure in the above provision for filing complaints, LAP asserts that redress procedures for any complaints of harassment were available to union members as set out in each respective union's "book."  (West Dep. 99-101.)

Beyond the cited provision in the National Pipeline Agreement, according to Richard West, the Pipe Line Contractors Association adopted a "No Harassment Policy" in 2008, and LAP has implemented that policy.  (West Dep. 115-16.)  The policy informs employees that racial harassment will not be tolerated and instructs employees to immediately report any types of harassment.  (*See* West Dep. Ex. 4, 5.)  Finally and also according to West, the company also has currently implemented its own policy titled the "L.A. Pipeline Construction Company, Inc.

27

Policy Against Discrimination and Harassment." (*See* West Dep. 120-23; Ex. 6.)

Aside from the nooses reported by Kevin Madden and Edward Blackwell, and Carper's use of slurs directed at Hispanic crew members reported by Samuel Jackson, many of the other allegations made by the claimants were not reported to LAP management. For instance, Samuel Jackson did not report Clyde Wade's statement about putting a rope around his neck, Jim Lee's comment referring to a bat as a "nigger knocker," Foreman Dave Arbaugh's reference to a Jamaican worker as a "coon," or coworker Rusty's statement about "niggers always killing each other" to LAP management. (Jackson Dep. 50, 55, 64, & 68.) The Court notes that Jeff Waggoner claims to have talked to Clyde Wade and Jackson within fifteen or twenty minutes of the rope incident, but remembers that Wade merely recounted the "joke" to him about lowering and raising Jackson up the steep hill with a rope because in West Virginia workers on steep hills really are sometimes secured around the waist with ropes or cables. (Waggoner Dep. 164-65.) According to Waggoner, the "joke," at least as relayed to him, did not involve putting a rope or cable around Jackson's neck. (Waggoner Dep. 164.)

Edward Blackwell did not report Dean Casto's comment that in some parts of West Virginia, a black person would only ever be a "nigger" to LAP management. (Blackwell Dep. 144.) Similarly, Akeem Durrette did not report seeing nooses, instances when he heard the term "wetback," seeing the "n" word and a noose scribbled on a pipe, and instances when he heard coworkers use the "n" word, although he did indicate that he failed to report some incidents because he was afraid of losing his job. (Durrette Dep. 40-45, 48, 51, & 58.) Lamont Barber reported seeing nooses to labor steward Ken Judy, and possibly mentioned seeing one of them to Foreman Rocky Webb, but did not otherwise report them to LAP management. (Barber Dep. 55-

28

59.) Likewise, Barber did not report to management that Webb was frequently telling him that he would be hung if he tried to go to Logan County, West Virginia, but also claims that Ken Judy was aware of these comments and would "sit there and joke around with it." (Barber Dep. 64.)

From the facts above, it is undisputed that LAP was aware of complaints about nooses, and Waggoner, aside from being aware that conversations among workers on the pipeline likely included topics related to race, also became aware from Samuel Jackson that John Carper, a foreman, was using racial epithets. Waggoner was also not surprised about Jim Lee's use of the "n" word. While allegations about foremen and other workers using epithets directed at blacks were not reported to LAP management, from the above, a jury could conclude that Waggoner was aware that such language was in use. LAP also was made aware from Madden's charge of discrimination that Carper had allegedly told Madden that Madden would be hung if he went to West Virginia to work.

Based upon the forgoing, it is also undisputed that upon receiving information about a noose being hung in a company truck, and upon receiving the complaint of discrimination from Columbia Gas and the charge of discrimination from the EEOC, LAP did take actions to investigate and address the allegations. However, in construing these facts in a light most favorable to the EEOC as the Court must do in resolving a motion for summary judgment, there is a genuine issue of material fact as to whether LAP's response was reasonable.

For instance, the record presents a disputed material fact as to whether LAP actually had an antidiscrimination policy in place in October 2007. A reasonable jury could conclude that a provision in the National Pipeline Agreement could not be construed to actually be a company policy, or that the average worker for LAP would likely have had knowledge of such a provision.

29

Additionally, a jury could find that, given the extreme forms of racial prejudice associated with nooses coupled with talk of blacks being hung in West Virginia, LAP's responses to nooses being present at its work site were not reasonable. In this regard, the record indicates that Ramsey and Harvey's employment with LAP ended in November 2007, but the record is vague as to whether they were actually fired because of the noose incident or simply laid off as the work dried up. Further, Waggoner claims that he initially thought that the noose issue was closed after his initial interviews with Ramsey and Harvey, but never interviewed Madden about the allegations, and only took further action when prompted to do so by external complaints.

While Carper was terminated after being investigated for using racial slurs, there is also a dispute in the record as to whether he was actually terminated for cause. From this, a reasonable jury could conclude that LAP only very reluctantly separated Carper despite the serious allegations against him. Finally, a reasonable jury could also conclude that, in light of the seriousness of the allegations of which LAP was aware, the meetings conducted by Waggoner and the "policies" implemented by LAP did not go far enough in attempting to eliminate racial harassment at LAP's work site. Accordingly, the Court finds that issues of LAP's awareness of racial harassment and the reasonableness of its responses to such harassment must be resolved by a jury.

### F.   DAMAGES

While the EEOC has stipulated that it is not seeking backpay or past or future pecuniary losses on behalf of the claimants (see Doc. 42), Title VII allows for the recovery of non-pecuniary and punitive damages in cases of unlawful intentional discrimination. *See* 42 U.S.C. § 1981a(a)(1) (2006). LAP asserts that the EEOC has not established genuine issues of material

fact that the claimants are entitled to non-pecuniary or punitive damages.

## 1.    NON-PECUNIARY DAMAGES

While none of the remaining claimants (except Edward Blackwell)[7] testified that he had incurred medical or other expenses for psychological trauma as a result of being subjected to the hostile work environment by LAP, each (albeit in sometimes contradictory testimony) has alleged some injury.  Kevin Madden claims that he felt fear and was hurt; Blackwell claims to have been offended and suffer from stress; Samuel Jackson claims to have been hurt and feel sadness; Lamont Barber felt saddened by the nooses; and Howard Morris claims to have suffered humiliation.

"A plaintiff's own testimony, along with the circumstances of a particular case, can suffice to sustain the plaintiff's burden in [establishing compensatory damages]." *Turic v. Holland Hospitality, Inc.*, 85 F.3d 1211, 1215 (6th Cir. 1996).  "It is well settled that Title VII plaintiffs can prove emotional injury by testimony without medical support." *Id.* "However, damages for mental and emotional distress will not be presumed, and must be proven by 'competent evidence.'" *Id.* (quoting *Carey v. Piphus*, 435 U.S. 247, 264 n.20 (1978)).  Here, by the slimmest of margins, the Court finds that the testimony from the remaining claimants concerning fear, humiliation, offense, hurt and sadness provides enough evidence for a reasonable jury to award at least some compensatory damages for non-economic injury to each of these claimants.

---

[7]Blackwell testified that he had visited a dermatologist for treatment for hair loss that he claims was caused by stress resulting from his employment with LAP.  (Blackwell Dep. 155-56.)

31

## 2.    PUNITIVE DAMAGES

A jury may award punitive damages for violations of Title VII if a complaining party

demonstrates that a defendant "engaged in a discriminatory practice or discriminatory practices

with malice or with reckless indifference to the federally protected rights of an aggrieved

individual." 42 U.S.C. § 1981a(b)(1) (2006).  The Sixth Circuit has held that

> an employer may be held vicariously liable for punitive damages "for the
> intentionally discriminatory conduct of its employee, where the employee served
> the employer in a managerial capacity, committed the intentional discrimination at
> issue while acting in the scope of employment, and the employer did not engage
> in good-faith efforts to comply with Title VII."

*Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 531 (6th Cir. 2005)(quoting *Lowery v. Circuit City*

*Stores, Inc.*, 206 F.3d 431, 442 (4th Cir. 2000)).

If the claim for punitive damages turned only on the conduct and language of co-workers,

who are not defendants, this Court would have no difficulty submitting this issue to a jury.

Instead, the question is whether the employer may be liable for punitive damages based upon

conduct and statements of co-workers.  The Court must determine whether the EEOC has

presented evidence from which a reasonable jury could conclude that the alleged discrimination

in this case was perpetrated by employees of LAP serving in a "managerial capacity."

"[W]hether an employee serves in a 'managerial capacity' is determined by 'the type of authority

that the employer has given to the employee, the amount of discretion that the employee has in

what is done and how it is accomplished." *Tisdale*, 415 F.3d at 531-32 (quoting *Kolstad v.*

*American Dental Ass'n*, 527 U.S. 526, 543 (1999)).  To serve in a "managerial capacity"

employees need not be "top management, officers, or directors" but must nevertheless be

"important." *Tisdale*, 415 F.3d at 532 (citing *Kolstad*, 527 U.S. at 543).

The Court finds that the EEOC has not presented sufficient evidence for a reasonable jury to conclude that the alleged harassment in this case was perpetrated by LAP employees in a managerial capacity. The Court has already determined, given the somewhat unusual organization of the company, LAP's foremen cannot be considered "supervisors" for purposes of assessing employer liability for a hostile work environment because they did not have unilateral authority to hire, fire, demote, transfer, discipline, or alter compensation. *See* Part II.E.1, *supra*. Accordingly, the foremen cannot then be considered to be "managerial employees" under the higher standard required to impute punitive damages to an employer.

The only managerial employees of LAP present at the Elkton and Winchester work sites were Jeff Waggoner, Pete Drake, and, during sporadic visits, Richard West, and the record is simply lacking of evidence that West, Waggoner, or Drake either perpetrated or condoned the acts of racial harassment alleged by the claimants. The only allegation against West was that on one occasion he ignored Edward Blackwell when Blackwell was trying to speak to him. Dean Casto later implied to Blackwell that West may have snubbed Blackwell out of racial animosity. As previously held, Casto's remark (at least as it relates to West) can be considered in evaluating Blackwell's subjective perception of the environment, but is hearsay to the extent that it could be probative of whether West snubbed Blackwell because of racism. Absent Casto's remark, West's snub of Blackwell was facially unrelated to race, and it accordingly would not be appropriate to expose LAP to punitive damages based on a single, race-neutral allegation against its president.

Turning to Waggoner, the only evidence that has been presented linking him personally to one of the allegations is his own admission that Clyde Wade's statement about using a cable or

33

rope to raise or lower Samuel Jackson up a steep hill was relayed to him by Wade within fifteen to twenty minutes after the statement was initially made. According to Waggoner, Wade's statement did not involve putting the cable around Jackson's neck and Waggoner took it to be a joke because in West Virginia, workers on steep hills are sometimes secured with cables and ropes. Jackson's deposition does not include any evidence contradicting Waggoner's recollection of how Wade's comment was relayed to Waggoner, and Jackson admitted not reporting his offense at the alleged remark to anyone. The EEOC has presented no evidence that Waggoner condoned the racial harassment alleged by the claimants. To the contrary, Waggoner took at least some affirmative steps to investigate the noose incident and Carper, and convey to the workforce that harassment would not be tolerated. While the reasonableness of these actions should be evaluated by a jury for the purpose of determining LAP's liability for compensatory damages, that Waggoner took these steps at all, coupled with the aforedescribed lack of evidence, precludes any reasonable jury, within the context of awarding punitive damages, from finding that he was somehow perpetrating the harassment. Accordingly, because the EEOC has presented no evidence from which a reasonable jury could conclude that LAP employees acting in a "managerial capacity" perpetrated or condoned the alleged harassment of the claimants, summary judgment is granted to LAP on the issue of potential punitive damages.

## III.  CONCLUSION

For the reasons set forth above, LAP's Motion for Summary Judgment (Doc. 51) is **GRANTED** as to the claims of Tasike Izzard and Akeem Durrette, and on the award of potential punitive damages, and **DENIED** as to the claims of Kevin Madden, Edward Blackwell, Lamont Barber, Howard Morris, and Samuel Jackson seeking non-pecuniary damages.

**IT IS SO ORDERED.**


<u>6-8-2010</u>
**DATED**

EDMUND A. SARGUS, JR.
**UNITED STATES DISTRICT JUDGE**